HOLTZCLAW, et ux v. MODEL CONSTRUCTION CO.

No. 58475.

Circuit Court, Duval County.

May 25, 1959.

James H. Dixon, Jacksonville, for plaintiffs.

Harold B. Haimowitz, Jacksonville, for defendant.

WILLIAM H. MANESS, Circuit Judge.

The complaint herein was first filed in the civil court of record of Duval County by plaintiffs, Troy F. Holtzclaw and Jimelle Holtzclaw, his wife, hereinafter referred to as "owners", against defendant, Model Construction Company, a Florida corporation, hereinafter referred to as "contractor," alleging the breach of an oral contract for the construction of a 16′ x 24′ addition to the owners' property and seeking recovery for damages resulting therefrom not exceeding $3,000, the jurisdictional limit of that court. Along with its answer denying the essential allegations of the complaint and asserting that the oral contract was a "costs plus 10% agreement", the contractor filed a counterclaim by which it claimed a lien for labor and materials furnished in accordance with its version of the contract and sought to invoke the equity jurisdiction of this court for the foreclosure of said lien. On proper motion, the entire cause was transferred to this court and the chancellor has heard the testimony presented by the parties on the issues made by the pleadings, considered the same and the exhibits filed in evidence, and now makes the following findings of fact and conclusions of law based thereon—

### Findings of Fact

Over a period of several weeks, or more, prior to September of 1957, the owners had been considering the addition of a "Florida room" to their home at 2851 Myra Street, Jacksonville, and had talked with at least two builders about their desires and got estimates on the cost thereof ranging from $1,700 up. Finally, through a friend, Ed Palmer, they were put in touch with Benjamin Spector, the president, owner and sole stockholder of the defendant corporation, also referred to as "contractor". No plans or specifications were prepared by the owners but the contractor (Spector) was told that they wanted a 16′ x 24′ room added, of concrete block construction, 11 windows, built-up roof (asphalt felt, tar and gravel), concrete floor with floor covering of wood-paneled interior and ceiling. The owners told the contractor what others had estimated the cost to the owners to be and the contractor said it could be built for $1,200 or "not over $1,500". The owners said, "If you can do it for that figure, go to work", with none of the more essential details of a valid contract specified than are above set forth.

The contractor knew that *price* was the paramount consideration in the owners authorizing him to "go to work". The contractor had plans prepared showing sufficient details to obtain a permit as required by the building department of the city of Jacksonville but such plans were not put in evidence and apparently did not even specify such details as the kind of wood paneling, number of windows, starting or completion date, contract price or quality of labor and materials. As to such details as were specified, such plans were apparently submitted solely for the *purpose of obtaining a permit,* since later developments show they were not strictly complied with. The contractor attempted to do the job and keep the costs down to $1,500, but from the beginning it is obvious that the owners and the contractor did not have a sufficient "meeting of the minds" to support a finding by this court as to the existence of a valid contract. Either in its effort to reduce costs, or through neglect, or both—

(a) The contractor failed to dig and pour the "footings" to the depth required by the city of Jacksonville, but this was overlooked by the inspector.

(b) The concrete workers left the concrete floor so rough that before the owners could have tile laid thereon, it had to be "stoned" to make it smooth.

(c) As the concrete block walls were put up the mortar joints were so uneven and so completely failed to match the mortar joints on the existing house that this work was condemned by the city inspector and had to be torn out and redone. Even when the work had been re-done, while it was passed by the inspector, there were still imperfections that show that the concrete block work was not done in a "good and workmanlike" manner.

(d) The carpenter work was subcontracted to one whose workmanship was so unsatisfactory that the owners finally stopped the work, but not until the roof was on and the interior walls were 90% paneled with V-joint paneling. There was a dispute as to the quality of the V-joint paneling and as to whether it should have been "pick-wick" paneling but since the V-joint paneling was not put up in a "good and workmanlike" manner, was out of plumb, and, because it was not properly attached to the concrete block walls, came loose and some fell off, it is not necessary to resolve this conflict because it had to be replaced.

(e) Instead of 11 windows, only 5 were installed and these were set into the walls without sufficient clearance to operate the "levers" or "cranks," which open and close the windows, after the paneling was installed. Special woodwork had to be made at owners' expense to make the windows usable.

The contractor also had its troubles with the owners, who, after the work got underway, saw that their dreams and the contractor's ideas and promises did not coincide. This friction no doubt kept Mr. Spector away from the job when he should have been present and led him to make promises he knew could not be fulfilled at later stages of construction. On the other hand, the owners felt re-assured by Mr. Spector's frequent statements that they would be pleased when the work was finished "if you'll just let the men alone." For this reason and blind faith, the owners suffered through the various stages of construction, still hoping that somehow the job would turn out all right, as the points of dissatisfaction grew to the breaking point on or about the last of October, 1957, when they stopped the carpenter-subcontractor when the paneling was 90% complete.

Finally, on October 31, 1957, a notice was placed on the premises by the city building department that "part of this work is not according to law and is therefore condemned," and further stated— "approved plans not being followed, windows and paneling out of ————and plumb, workmanship is bad." (Plt's. exh. no. 1). That this is true is further evidenced by looking at plaintiffs' exhibit no. 4.

Apparently, the owners still had some hope that the job would be satisfactorily completed as late as October 27, 1957, at which time they made a voluntary payment to the contractor in the amount of $605.68. This payment was actually made to Benjamin Spector personally but by stipulation is to be considered as having been made to the contractor.

After the notice of condemnation, the contractor offered to send another carpenter to "do everything needed" but the owners refused in order to obtain advice of counsel. Without making any further attempt to get the work corrected and underway again, several weeks later the contractor sent someone to pick up the materials left on the job but said nothing to the owners who turned the person away not knowing who he was or what authority he had to remove the contractor's materials. Neither did the owners call on the contractor to do anything further and undertook to complete the work themselves.

Expert testimony showed that the reasonable value of the project ranged from an actual cost of $2,500 to $3,500, including a reasonable profit. After the work was condemned, the owners tried to get bids to make the corrections necessary and complete the job, but as Fred Ingram, expert witness, said "the general defects were too numerous to try to correct" and the owners were forced (by lack of money to tear the structure down and start over) to salvage what could be used and complete the job with day labor and their own efforts, the value of which is immaterial in view of the fact that this court finds there was no express contract.

The actual cost to the defendant-contractor of the labor and materials which were used by the owners in the completion of the project are as follows—

   (a) Footing and floor (384 square feet, less 64 square feet, @$1.50 per square foot) _____$ 480

   (b) Walls, including lintels, in place _____ 200

   (c) Windows, including glazing, in place _____ 175

   (d) Roof, including rafters, sheeting and built-up roofing _____ 300

        Total _____$1,155

However, each of the foregoing items had and still have some flaws and imperfections on the basis of which the owners would be justified in rejecting the work if it were possible to do so, and for which it is impossible to compute compensatory damages.

The owners sold materials of the contractor which were abandoned on the site for approximately $50, and Caruso Electric, who was employed by the contractor, has not been paid and has a claim for $50 which the owners may be held liable to pay.

### Conclusions of Law

Based on the foregoing findings of fact, the court is of the opinion that since there was no express contract, the plaintiff-owners have failed to prove the material allegations of their complaint and are not entitled to recover thereon, unless they are entitled to a refund of the $605.68 partial payment. By the same reasoning, defendant-contractor's right to recover on its counterclaim and to foreclose its alleged lien must be on a quantum meruit basis (as much as it reasonably deserves), if at all, in the absence of an express contract.

The theory of the law which permits the defendant to recover the actual cost of labor and material expended in *improving* the owners' property, in the absence of an express contract, is to prevent the owners being *unjustly* enriched at the expense of the contractor by reason of the failure of what both parties thought was a contract. The question before this court now is whether or not the owners' property has been *improved* in fact and whether or not the owners would be in fact *unjustly* enriched if the contractor was denied a recovery even though limited to a quantum meruit basis. The workmanship of the persons employed by defendant to perform labor was of a quality below the minimum to be expected even on a job where the primary consideration was effecting the maximum degree of economy. While substantial shortcomings of the contractor were approved, with some work required to be done over, the city building inspector finally did call a halt to construction by condemning the job when it was from 60% to 90% complete. At that point, the owners had little choice but to accept, with a high degree of dissatisfaction, a major portion of the work notwithstanding the fact of its sub-standard workmanship and, to minimize damages, worked out satisfactory arrangements with the city to permit completion of the work. No doubt the owners would have much preferred to have the contractor undo and take away all that had been done and restore the status quo. This could not be done. Instead they are now, by force of circumstances, required to face an imperfect monument to an unhappy experience which, no doubt, will give rise to damages the extent of which cannot be measured. Therefore, this court is of the opinion that as a matter of law, the contractor did not *improve* the property of the owners and that by the forced retention and acceptance of part of the work and materials of the contractor, the owners were not *unjustly* enriched. Considerations of economy cannot excuse a contractor who undertakes to do a job from furnishing labor that will meet the minimum standard set by ordinances of a municipality wherein the work is to be done.

Even if this were not so, this court is also of the opinion that the principle of equity that "he who comes into equity, must come with clean hands" should be applied in this case. See 19 Am. Jur., pages 323 through 332; Equity, sections 469 through 479. Except in unusual circumstances not present here, a property owner does not bargain on an equal footing with one who is regularly engaged in home improvement work. The legislature has given the contractor a lien for his work and materials and even though a contract may not measure up to the requirements of law, the contractor stands to lose little, compared to the owner, because the law will imply an

obligation of the owner to pay on a quantum meruit basis. Hence, in many cases, the home-owner is at the mercy of the contractor where there is no written agreement and no plans or specifications and a dispute arises. Furthermore, it is a matter of common knowledge that disputes and misunderstandings do frequently arise during new construction and home improvement work, especially where the owner has never before gone through the experience. This is not to say such disputes are always the fault of the contractor. In most instances they grow out of a total ignorance on the part of the owner of what can be expected and how the work is to be done. But it is the contractor who knows these things best and does or should realize the necessity for a definite written agreement to avoid such misunderstandings. Therefore, this court holds that a person or corporation in the home-improvement business, who— (a) fails to obtain a written contract for the work to be done, and (b) after having undertaken improvements to real property, encounters a misunderstanding which such an agreement would have avoided, *may* be denied relief in a court of equity in the enforcement of an alleged lien on the theory of "unclean hands." Application of that principle to the circumstances of this case, coupled with the fact that the defendant-contractor's work was actually so poorly done that it was finally condemned, after which only a token effort, if any, was made to complete the work, compels this court to deny enforcement of any lien for any amount because defendant does not come into equity with clean hands.

The only remaining question is the right of plaintiffs, under the circumstances of this case, to recover the $605.68 paid Benjamin Spector. If the amount had never been paid, this court would not require it to be paid under the foregoing principles. However, this court cannot overlook the fact that such payment was voluntarily made just four days before work was stopped by the owners and condemned by the city; nor, that at the time the payment was made, the owners were well aware of the deficiencies of the contractor's work; and, in the absence of any facts subsequently developed giving rise to damages not then known or apparent, it will be presumed that such payment constituted an acknowledgement that the work thus far done had a value to the owners of at least that amount. Therefore, this court holds that the plaintiff-owners are estopped to deny that the defendant-contractor is entitled to retain the amount of said payment.

Accordingly, judgment for defendant on plaintiffs' complaint and a decree for plaintiffs on defendant's counterclaim, discharging the property described in said counterclaim of and from defendant's asserted lien, will be entered by separate order this date.